**KLAMATH–SISKIYOU WILDLANDS CENTER, et al., Plaintiffs,**

v.

**Patricia A. GRAHAM, et al, Defendants.**

**No. 2:11–cv–00439–MCE–JFM.**

United States District Court, E.D. California.

Sept. 28, 2012.

ized Travel Management Environmental Impact Statement. Plaintiffs contend that the Final Environmental Impact Statement ("FEIS") issued by the Forest Service in August of 2010 violates the provisions of the National Environmental Policy Act, National Forest Management Act, and Clean Water Act. Presently before the Court are the parties' cross-motions for summary judgment.[1] For the reasons set forth below, Plaintiffs' motion is DENIED and Defendants' motion is GRANTED in its entirety.

## BACKGROUND

### A. Statutory Framework

#### 1. National Environmental Policy Act

Congress enacted the National Environmental Policy Act ("NEPA") in 1969 to protect the environment by requiring certain procedural safeguards before an agency takes action affecting the environment. The NEPA process is designed to "ensure that the agency ... will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger [public] audience." *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1212 (9th Cir.1998) (quoting *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989)). The purpose of NEPA is to "ensure a process, not to ensure any result." *Inland Empire Pub. Lands Council v. U.S. Forest Serv.,* 88 F.3d 754, 758 (9th Cir.1996). "NEPA emphasizes the importance of coherent and comprehensive up-front environmental analysis to ensure informed decision-making to the end that the agency will not act on incomplete information, only to regret its decision after is it too late to correct." *Center for Biological Diversity v. U.S.*

Elizabeth K. Crosson, Law Offices of Elizabeth Crosson, Venice, CA, Susan Jane M. Brown, PHV, Western Environmental Law Center, Portland, OR, Erik Schlenker–Goodrich, PHV, Western Environmental Law Center, Taos, NM, for Plaintiffs.

Adam J. Katz, Peter Christopher Whitfield, U.S. Department of Justice, Washington, DC, David B. Glazer, U.S. Department of Justice, San Francisco, CA, for Defendants.

## MEMORANDUM AND ORDER

MORRISON C. ENGLAND, JR.,
District Judge.

Through the present action, Plaintiffs Klamath–Siskiyou Wildlands Center, Wildlands Center for Preventing Roads, Environmental Protection Information Center, Wilderness Society and Klamath Forest Alliance (hereinafter "Plaintiffs") seek declaratory and injunctive relief from the adoption by Defendants United States Forest Service ("Forest Service") and Patricia A. Grantham, Klamath National Forest Supervisor, (hereinafter "Defendants") of the Record of Decision ("ROD") approving the Klamath National Forest Motor-

---

1. Because oral argument will not be of material assistance, the Court orders this matter submitted on the briefs. E.D. Cal. Local Rule 230(g).

*Forest Serv.*, 349 F.3d 1157, 1166 (9th Cir. 2003). Complete analysis under NEPA also assures that the public has sufficient information to challenge the agency's decision. *Methow Valley Citizens Council*, 490 U.S. at 349, 109 S.Ct. 1835.

NEPA mandates that all federal agencies, including the Forest Service, prepare a "detailed statement" that discusses the environmental ramifications and alternatives to all "major Federal Actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). These statements must include a description and analysis of the environmental impact of the proposed action, any adverse environmental effects that cannot be avoided if the action is implemented, alternatives to the proposed action, the relationship between short-term uses and long-term productivity, and any irreversible or irretrievable commitment of resources that would be involved if the action were to be implemented. *Id.; Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1153 (9th Cir.2006). "In short, NEPA requires that a federal agency 'consider every significant aspect of the environmental impact of a proposed action' and 'inform the public that it has indeed considered environmental concerns in its decision-making process.'" *Id.* (quoting *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1066 (9th Cir.2002)). Thus, an agency must take a "hard look" at the consequences, environmental impacts, and adverse environmental effects of a proposed action within an environmental impact statement. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). If an environmental impact statement adequately discloses such effects, NEPA's goal is satisfied. *Inland Empire Pub. Lands Council*, 88 F.3d at 758.

### 2. National Forest Management Act and Northwest Forest Plan

In 1976, Congress enacted the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq.*, which governs the Forest Service's management of national forests. The NFMA imposes both procedural and substantive requirements on the Forest Service's management of national forests. *Hapner v. Tidwell*, 621 F.3d 1239, 1246 (9th Cir.2010). The Service's procedural responsibilities under the NFMA include development and maintenance of a comprehensive Land and Resource Management Plan ("LRMP") for each national forest. 16 U.S.C. § 1604(a); *Hapner*, 621 F.3d at 1246. In developing and maintaining each plan, the Forest Service is required to use "a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences." 16 U.S.C. § 1604(b). Once a forest plan is adopted, all subsequent agency actions must comply with that plan. *Id.* § 1604(i); *Hapner*, 621 F.3d at 1246. The Forest Service should examine the proposed project's compliance with the applicable forest plant during the NEPA process. *Center for Sierra Nevada Conservation v. U.S. Forest Serv.*, 832 F.Supp.2d 1138, 1142 (E.D.Cal.2011) (citing *Inland Empire Pub. Lands Council*, 88 F.3d at 757).

In 1994, the Forest Service and the Bureau of Land Management adopted the Northwest Forest Plan ("NWFP") to provide a regional strategy for managing the National Forests of Northern California, Oregon and Washington for ecological and socio-economic benefits. *See* AR [2] 18281–18511. The NWFP establishes a system of land "allocations," including Late Successional Reserves ("LSR"), Adaptive Management Areas, and Riparian Re-

---

**2.** Unless otherwise indicated, all citations to the administrative record lodged with the Court will be specified as "AR".

serves. *Id.* at 18289. Each land allocation is governed by a different set of Standards and Guidelines ("S & Gs"). However, some S & Gs apply to all land allocations. *Id.* at 18410.

In addition to the land allocations, the NWFP created the Aquatic Conservation Strategy ("ACS") to restore and maintain the ecological health of watersheds and aquatic ecosystems contained within them on public lands. *Id.* at 18383. The nine Aquatic Conservation Strategy Objectives require the Forest Service to "maintain and restore" key aquatic and watershed processes. *Id.* at 18385.

### 3. Clean Water Act

The stated purpose of the Clean Water Act ("CWA") is to restore and maintain the chemical, physical and biological integrity of the Nation's waters. 33 U.S.C. § 1251(a). "The CWA requires federal agencies to determine that approved actions do not result in pollution in violation of state water quality standards." *Greater Yellowstone Coal. v. Lewis,* 628 F.3d 1143, 1149 (9th Cir.2010) (citing 33 U.S.C. § 1323(a)). To achieve its statutory objectives, the CWA authorized each state to develop water quality standards for all waters within its boundaries. 33 U.S.C. §§ 1311(b)(1)(C), 1313. "A water quality standard defines the water quality goals of a water body, or portion thereof, by designating the use or uses to be made of the water and by setting criteria necessary to protect the uses." 40 C.F.R. § 131.2. Water quality standards also prevent further degradation of that water body with "anti-degradation" provisions. *Id.* § 131.12.

States identify impaired waters that do not meet water quality standards and "establish a priority ranking for such waters, taking into account the severity of the pollution and the uses to be made of such waters." 33 U.S.C. § 1313(d)(1)(A). States periodically submit lists of such impaired waters to EPA as the "303(d) list," and must develop a "total maximum daily load" ("TMDL") for each pollutant of concern in each waterbody identified under Section 303(d). *Id.* § 1313(d). A TMDL represents the maximum amount of pollutant "loading" that a waterbody can receive from all combined sources without exceeding applicable water-quality standards. *City of Arcadia v. EPA,* 265 F.Supp.2d 1142, 1144 (N.D.Cal.2003). TMDLs are "not self-enforcing, but serve[ ] as an informational tool or goal for the establishment of further pollution controls." *City of Arcadia v. EPA,* 411 F.3d 1103, 1105 (9th Cir.2005). In California, the North Coast Regional Water Quality Control Board ("Water Board") has developed TMDLs the Scott, Shasta and Salmon Rivers, and a draft TMDL for the Klamath River.[3] AR 1061.

The CWA uses different methods to control pollution released from point sources and nonpoint sources. *Pronsolino v. Nastri,* 291 F.3d 1123, 1126 (9th Cir.2002). Point source pollution is controlled directly by the CWA's federal permit program. *Oregon Nat'l Desert Ass'n v. Dombeck,* 172 F.3d 1092, 1096 (9th Cir.1998). By contrast, nonpoint source pollution "is not regulated directly by the Act" and is instead left to the States to regulate under state programs. *Id.*

### B. Brief Factual Background[4]

In 2005, the Forest Service adopted a final rule governing management of motor vehicle travel within the National Forests

---

**3.** Together, these four rivers cover every stream on the Klamath National Forest. AR 1061.

**4.** The facts of this case are, for the most part, undisputed. In recounting the relevant facts, the Court cites to the Administrative Record ("AR").

("Travel Management Rule"). 70 Fed. Reg. 68,264–291 (Nov. 9, 2005). The Travel Management Rule addresses the need to regulate previously unrestricted motor vehicle travel on the National Forests. *See id.* at 68,264–65. This litigation concerns Subpart B of the Travel Management Rule, "Designation of Roads, Trails, and Areas for Motor Vehicle Use." Subpart B provides for the designation of National Forest System ("NFS") roads, NFS trails, and areas on NFS lands for motor vehicle use by vehicle type and time of year. 36 C.F.R. §§ 212.50–212.57. The Travel Management Rule requires that, in designating roads, trails, and areas for motor vehicle use, the Forest Service must balance, among other things, the need to protect NFS resources with the need to allow reasonable access for motor vehicles. *Id.* § 212.55(a). Once roads, trails and other areas are designated for motor vehicle use, all motor vehicle uses inconsistent with those designations are prohibited. *Id.* §§ 212.50(a), 261.13.

Currently, the National Forest Transportation System ("NFTS") on the Klamath National Forest consists of approximately 4,536 miles of designated roads. AR 826. The roads that comprise the NFTS were developed in connection with various authorized activities on the Klamath National Forest, such as timber harvest, resource management, fire control and public recreation. *Id.* at 602, 826. The Klamath Forest also contains about 800 miles of roads and trails that are not part of the official NFTS. *Id.* at 1399. These "unauthorized" or "user-created" routes have been created by the passage of vehicles over land as visitors have sought access for recreation and other purposes. *Id.* at 604, 825.

On October 7, 2008, the Forest Service published a Notice of Intent to Prepare an Environmental Impact Statement for the Klamath National Forest Motorized Travel Management ("MTM") project that was intended to implement the 2005 Travel Management Rule. *Id.* at 3213–3216. The public scoping period began on October 7, 2008, and ended on December 6, 2008. The draft environmental impact statement ("DEIS") was published on May 21, 2009. *Id.* at 1696. The Forest Service provided 45 days for public comment and then extended the comment period on the DEIS for another 15 days. *Id.* at 618. Additionally, the Forest Service hosted a series of open houses to provide additional information to interested parties and to invite public comments. *Id.* Plaintiffs provided comments on the DEIS. *Id.* at 2599, 2715.

The Forest Service published the MTM FEIS on January 29, 2010, and again provided for public review and comment, as well as a second series of open houses. *Id.* at 619. The action alternatives considered by the Forest Service in the FEIS ranged from no Forest-wide prohibition on cross-country motorized travel and no changes to the existing NFTS (i.e., leaving the status quo intact) (Alternative 1), to prohibiting cross-country motorized travel, while adding no new routes to the NFTS (Alternative 3), to an action that would have maximized motor vehicle use on the Klamath National Forest (Alternative 5). *Id.* at 805–06. The Forest Service considered comments on the FEIS and responded to those comments in the ROD.

On July 29, 2010, the Forest Service adopted the MTM ROD, which implemented the 2005 Travel Management Rule. *Id.* at 598–634. The ROD addresses the need to prohibit unrestricted off-road travel on the Klamath National Forest, while recognizing that many user-created routes are not environmentally damaging and that some are necessary to allow access to remote sites for legitimate recreation opportunities. *Id.* at 603–604. The ROD approved a modified version of Alternative 7, which will implement the following actions:

(1) prohibiting cross-country travel (i.e., off-road or off-trail) through the 1.7 million acre Klamath National Forest; (2) adding 53 of user-created roads to the NFTS; and (3) adding 20 miles of user-created trails to the NFTS. AR 608. The Forest Service will produce a Motor Vehicle Use Map ("MVUM") that will identify all routes open to motor vehicle use. *Id.* at 602–03.

Plaintiffs timely administratively appealed the ROD in two appeals filed on September 14, 2010, and September 27, 2010. *Id.* at 81, 310. Deputy Regional Forester Ronald Ketter denied Plaintiff's administrative appeals on November 8, 2010. *Id.* at 7, 10.

## STANDARD

### A. Summary Judgment

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Karuk Tribe of Cal. v. U.S. Forest Serv.,* 681 F.3d 1006, 1017 (9th Cir.2012) (en banc).

Under summary judgment practice, the moving party

> always bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.' " *Id.* at 324, 106 S.Ct. 2548. Indeed, summary judgment should be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.* at 322, 106 S.Ct. 2548. In such a circumstance, summary judgment should be granted "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323, 106 S.Ct. 2548.

Summary judgment is appropriate in cases, like the present matter, which involve judicial review of administrative action where review is based upon an administrative record. *Karuk Tribe of Cal.,* 681 F.3d at 1017. The court's role in considering summary judgment in this context is not so much to resolve contested questions of fact which may exist in the record; instead, "the court must determine the legal question of whether the agency's action was arbitrary and capricious." *Gilbert Equip. Co., Inc. v. Higgins,* 709 F.Supp. 1071, 1077 (S.D.Ala.1989), *aff'd,* 894 F.2d 412 (11th Cir.1990); *see also Occidental Eng'g Co. v. I.N.S.,* 753 F.2d 766, 769 (9th Cir.1985) (stating the court's role "is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did").

### B. APA Standard

Plaintiff brings the instant challenges under NEPA, NFMA and CWA pursuant to the APA.[5] Thereunder, the court may

---

5. Because NEPA does not contain a separate provision for judicial review, courts review an agency's compliance with NEPA under the APA, 5 U.S.C. § 706(2)(A). *Ka Makani 'O*

*Kohala Ohana Inc. v. Water Supply,* 295 F.3d 955, 959 (9th Cir.2002). Claims raising violations of the NFMA and CWA are also brought

set aside a final agency action only where the action is "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with the law." 5 U.S.C. § 706. "A decision is arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *O'Keeffe's, Inc. v. U.S. Consumer Product Safety Comm'n,* 92 F.3d 940, 942 (9th Cir.1996) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). An agency action is also arbitrary and capricious if the agency fails to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43, 103 S.Ct. 2856.

Review under the APA is "searching and careful." *Ocean Advocates v. United States Army Corps of Eng'rs,* 402 F.3d 846, 858 (9th Cir.2005). However, the court may not substitute its own judgment for that of the agency. *Id.* In short, the court must ensure that the agency has taken a "hard look" at the environmental consequences of its proposed action. *Oregon Natural Resources Council v. Lowe,* 109 F.3d 521, 526 (9th Cir.1997). As part of this inquiry, the court should ask whether the agency's decision "was based on a consideration of the relevant factors and whether there has been a clear error in judgment." *Ocean Advocates,* 402 F.3d at 859. In addition, the court determines whether the agency "articulated a rational

connection between the facts found and the choice made." *Id.* at 859 (quoting *Arizona Cattle Growers' Ass'n v. United States Fish and Wildlife Serv.,* 273 F.3d 1229, 1236 (9th Cir.2001)).

■ In complex cases, "where the agency must comply with a multitude of obligations, many of which pull the agency in competing directions, and which collectively lead to a record of tens of thousands of pages, this standard extends beyond mere deference to the agency's considered judgment. The court will additionally overlook minor gaffes in the record." *Center for Sierra Nevada Conservation,* 832 F.Supp.2d at 1149. The court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43, 103 S.Ct. 2856.

## ANALYSIS

### A. NEPA Claims

■ Plaintiffs make three arguments for why Defendants violated NEPA in the preparation of the MTM ROD and FEIS: (1) the Forest Service failed to consider a reasonable range of alternatives; (2) the Forest Service failed to consider connected, cumulative, and/or similar actions; and (3) the Forest Service failed to disclose environmental information and consequences of the proposed action. Plaintiffs' Memorandum in Support of Motion for Summary Judgment ("Pls' Mot."), at 14–24. [ECF No. 25.] For the reasons stated below, the Court finds that the Forest Service has complied with NEPA provisions in implementing the MTM ROD and thus did not act arbitrary or capriciously.

pursuant to the APA and governed by the "arbitrary and capricious" standard. *See Greater Yellowstone Coalition v. Lewis,* 628

F.3d 1143 (2010) (applying the APA's "arbitrary and capricious" standard to plaintiffs' claims under the NFMA and CWA).

## 1. The Forest Service Considered a Reasonable Range of Alternatives

Plaintiffs contend that the FEIS runs afoul of NEPA in failing to consider an "alternative that would have reduced the size of the NFTS." Pls' Mot. at 15. Plaintiffs argue that, "[i]nstead of considering an alternative that would physically remove routes from the landscape or refrain from designating all existing system routes for motorized use, all of the alternatives analyzed in the FEIS increase the size of the NFTS, and designate motor vehicle use on all of the NFTS roads that were previously open to motor vehicle use." Pls' Mot. at 16. Defendants counter that the MTM ROD and FEIS's consideration of reasonable range of alternatives was adequate under NEPA. Defendants' Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of Defendants' Cross–Motion for Summary Judgment ("Dfts' Opp.") at 10. [ECF No. 28–1.]

█ In preparing an environmental impact statement ("EIS"), NEPA requires the agency to "study, develop and describe appropriate alternatives to recommended courses of action in any proposal which involved unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). The alternatives analysis is the "heart" of an EIS. *Center for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 642 (9th Cir.2010) (citation omitted). "The touchstone for [the court's] inquiry is whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation." *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir.2004). "The existence of a viable but unexamined alternative renders an environmental impact statement inadequate." *Morongo Band of Mission Indians v. FAA*, 161 F.3d 569,

575 (9th Cir.1998) (internal quotation marks omitted). However, only feasible alternatives, rather than an infinite range of alternatives, need be considered under the so-called "rule of reason" standard. *City of Carmel–by–the–Sea v. U.S. Dept. of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997). Additionally, the agency does not need to consider alternatives not reasonably related to the project's stated goal and purpose. *League of Wilderness Defenders–Blue Mountains Biodiversity Project v. U.S. Forest Service*, 689 F.3d 1060, 1071 (9th Cir.2012); *see also City of Angoon v. Hodel*, 803 F.2d 1016, 1021 (9th Cir.1986). ("When the purpose is to accomplish one thing, it makes no sense to consider the alternative ways by which another thing might be achieved."). The Forest Service articulated the following four "needs" for the FEIS and ROD: (1) "a need for regulation of unmanaged motor vehicle travel by the public"; (2) "a need for the Klamath Forest Plan to conform to the Travel Management Rule, 36 C.F.R. 212 Subpart B"; (3) "a need for limited changes to the NFTS to ... provide wheeled motorized access to dispersed recreation opportunities" and "provide a diversity of motorized recreation opportunities"; and (4) "a need for socially compatible use by non-highway-legal vehicles in the vicinity of Hawkinsville where trespass, destruction of private property, and other use conflicts facilitated by the use of [off-highway vehicles] have become a problem." AR 603–05, 829–30. To achieve the project's stated purposes, the Forest Service analyzed seven alternatives in its MTM FEIS. *Id.* at 802–03. These ranged from no Forest-wide prohibition on cross-country motorized travel and no changes to the existing NFTS (i.e., leaving the status quo intact) (Alternative 1), to prohibiting cross-country motorized travel, while adding no new routes to the NFTS (Alternative 3), to an action that would

have maximized motor vehicle use on the Klamath (Alternative 5). *Id.*

This Court should afford the Forest Service "considerable discretion to define the purpose and need of [its] project." *See Friends of Southeast's Future v. Morrison,* 153 F.3d 1059, 1066 (9th Cir.1998). All seven alternatives considered by the Forest Service in the FEIS were directly related to the MTM project's stated purpose of addressing "unmanaged motor vehicle travel by the public" on the Klamath National Forest. As Defendants point out, the MTM project does not contemplate removal of any authorized roads from the NFTS. Dfts' Opp. at 11. Inclusion of an alternative providing for decommissioning of existing NTFS roads would have greatly expanded the scope and complexity of the MTM project, while not directly addressing the project's stated purpose of dealing with the problem of unmanaged cross-country travel on the Klamath National Forest.

A recent decision of the district court for the District of Idaho is instructive. *See Wilderness Society v. U.S. Forest Serv.,* 850 F.Supp.2d 1144 (D.Idaho 2012). In *Wilderness Society,* environmental groups challenged the Forest Service's finding of no significant impact ("FONSI") and environmental assessment ("EA") that allowed the agency to designate 1,196 miles of roads and trails in the Sawtooth National Forest for motorized recreational use. *Id.* at 1150. The stated purpose of the FONSI and EA in *Wilderness Society,* similar to the present case, was "revision of the ... Travel Plan Map to restrict motor vehicle use to designated roads and trails so as to conform to the 2005 Travel Management Rule." *Id.* at 1163–64. The environmental groups argued, *inter alia,* that the Forest Service violated NEPA by failing to consider "an alternative that reduced motorized route densities in degraded subwatersheds, stabilized and decommissioned non-system routes, prohibited routes in sensitive subwatersheds, and closed specific routes." *Id.* at 1163. The court disagreed and concluded that, in light of the project's limited purpose to restrict motor vehicle use to designated roads and trails, the Forest Service did not have to consider an alternative providing for closure or decommissioning of any existing NFTS routes. *Id.* at 1163–64. The court specifically concluded that "the Forest Service was not required to consider a 'conservation-oriented alternative' as it was not reasonable given the stated purpose of the proposed action." *Id.* at 1164.

Additionally, the 2005 Travel Management Rule, pursuant to which the Forest Service adopted the ROD, expressly does not require that the Forest Service revisit previous decisions of what roads should be within the NFTS. *See* 70 Fed.Reg. 68, 269 ("This final rule does not require responsible officials to reconsider decisions authorizing motor vehicle use on NFS roads and NFS trails."). When the agency takes an action "pursuant to a specific statute, the statutory objectives of the project serve as a guide by which to determine the reasonableness of objectives outlined in an EIS." *Westlands Water Dist.,* 376 F.3d at 866. Thus, the Forest Service may shape the project's purpose and need statement according to applicable statutory and regulatory requirements. Inclusion of an alternative contemplating closure or decommissioning of existing NFTS routes would have required the Forest Service to reexamine the entire NFTS system. Such a massive undertaking is clearly beyond the MTM ROD's limited scope to address motor vehicle use on unauthorized routes on the Klamath National Forest pursuant to the regulatory requirements of the 2005 Travel Management Rule.

Therefore, in light of the stated purpose of the MTM ROD, the Forest Service's decision to limit the scope of the MTM project to addressing motor vehicle use on unauthorized routes was reasonable. The Forest Service did not act arbitrary or capriciously when it failed to consider closure or decommissioning of existing NFTS routes within the MTM project.

### 2. The Forest Service did not Fail to Consider Any Connected or Cumulative Actions

Plaintiffs argue that the Forest Service violated NEPA by failing to assess the environmental impacts of a connected or cumulative action within the MTM FEIS.[6] Pls' Mot. at 17–20. In particular, Plaintiffs assert that the agency should have assessed "the environmental consequences of the entire [NFTS], not just the 73 miles of routes and roads the agency added to the NFTS in the MTM FEIS and ROD." *Id.* at 19.

■ NEPA and its implementing regulations direct an agency to include within the scope of its environmental analysis a consideration of "actions" that are "connected," "cumulative," or "similar." 40 C.F.R. § 1508.25(a). When two actions are "connected" or "cumulative," an agency must consider both actions in the same environmental impact statement. *Klamath–Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 999 (9th Cir.2004).

#### a. Connected Actions

"Connected" actions are actions that: (1) "automatically trigger other actions which may require environmental impact statements"; (2) "[c]annot or will not proceed unless other actions are taken previously or simultaneously"; and (3) "[a]re independent parts of a larger action and depend on the larger action for their justification." 40 C.F.R. § 1508.25(a)(1). By contrast, "[w]hen one of the projects might reasonably have been completed without the existence of the other, the two projects have independent utility and are not 'connected' for NEPA's purposes." *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 969 (9th Cir.2006). The purpose of NEPA's "connected actions" requirement is "to prevent an agency from dividing a project into multiple 'actions,' each of which individually has an insignificant environmental impact, but which collectively have a substantial impact." *Id.* (citations omitted).

Plaintiffs argue that "the 73 miles of routes the Forest Service proposes to add to the NFTS would not exist but for the larger NFTS, to which they are being added ... [and] would have no 'independent utility' without the NFTS." Pls' Mot. at 19. Plaintiffs further argue that "the proposed action is 'inextricably intertwined' with the NFTS" because "there is no indication in the administrative record that the 73 miles of routes proposed for addition to the NFTS would exist in a vacuum without the NFTS to which they connect." *Id.* at 20. Thus, according to Plaintiffs, the MTM project and the existing NTFS are "connected" actions for purposes of NEPA, which triggers the Forest Service's obligation to assess the environmental consequences of both "actions." *Id.* Defendants counter that the "existing infrastructure" is not an action under NEPA, and, therefore, Plaintiffs failed to identify any "action" that would be "con-

**6.** Although Plaintiffs broadly assert that the Forest Service "failed to consider connected, cumulative, and/or similar actions," Pls' Mot. at 17, Plaintiffs' Memorandum in Support of Motion for Summary Judgment does not address what "similar" action the Forest Service failed to consider and does not provide any legal support demonstrating such a failure. Therefore, the Court limits its analysis to the examination of Plaintiffs' argument concerning "connected" and "cumulative" actions.

nected" to the MTM project. Dfts' Opp. at 14.

Under NEPA, federal "action" includes "new or continuing activities ...; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals." 40 C.F.R. § 1508.18(a). Federal actions generally fall within the following categories: "(1) Adoption of official policy"; (2) "Adoption of formal plans"; (3) "Adoption of programs"; and (4) "Approval of specific projects." *Id.* § 1508.18(b). In their Reply, Plaintiffs argue that the existing NFTS infrastructure is a "continuing" activity under NEPA and, thus, qualifies as a "connected" action subject to environmental assessment in the FEIS. Plaintiffs' Reply Memorandum in Support of Motion for Summary Judgment ("Pls' Reply"), at 4–5. (ECF No. 29.) Plaintiffs specifically rely on the Ninth Circuit's statement in *Upper Snake River Chapter of Trout Unlimited v. Hodel,* 921 F.2d 232, 234–235 (9th Cir.1990), that "if an ongoing project undergoes changes which themselves amount to 'major Federal actions,' the operating agency must prepare an EIS." Pls' Reply at 5.

■ Contrary to Plaintiffs' assertion, *Upper Snake River* does not support the conclusion that the existing NFTS system is an "action" for the purposes of NEPA analysis. In that case, the Ninth Circuit considered whether the Bureau of Reclamation was required to assess environmental impacts of the Bureau's periodic adjustments of water from the dam, which had been constructed before NEPA's enactment. *Upper Snake River,* 921 F.2d at 233. The court concluded that the agency did not have to conduct such an environmental assessment because, *inter alia,*

> [w]hat [the Federal Defendants] did in prior years and what they were doing during the period under consideration were no more than the routine managerial actions regularly carried on from the outset without change. They are simply operating the facility in the manner intended. In short, they are doing nothing new, nor more extensive, nor other than that contemplated when the project was first operational. Its operation is and has been carried on and the consequences have been no different than those in years past.

*Id.* at 235. Therefore, the continuous management and operation of the dam did not constitute a "major Federal action," requiring an EIS. *Id.* at 235–36.

In this case, the Forest Service's continuous operation and management of the NFTS is akin to the Bureau's operation and management of the dam in *Upper Snake* River. The NFTS has been in existence for many decades. As Defendants point out, many routes within the NFTS were in existence before the adoption of NEPA, and the Forest Service has been continuously managing and operating the system since then. *See* AR 602, 916. Because an agency "need not discuss the environmental effects of mere continued operation of a facility," *Burbank Anti–Noise Group v. Goldschmidt,* 623 F.2d 115, 116 (9th Cir.1980), the Court concludes that the existing NFTS infrastructure is not an action "connected" to the MTP project for NEPA purposes.

Plaintiffs also rely on *Save the Yaak Committee v. Block,* 840 F.2d 714 (9th Cir.1988), and *Thomas v. Peterson,* 753 F.2d 754 (9th Cir.1985), to support their claim that the existing NFTS is a "connected action" for NEPA purposes. Pls' Mot. at 17–20. Both cases involved the Forest Service's failure to analyze the environmental impacts of a logging road in connection with a proposed timber sale. *See Peterson,* 753 F.2d at 757; *Save the Yaak Committee,* 840 F.2d at 719. In both cases, the Ninth Circuit held that a road construction for the purpose of facilitating

timber sales was an action "connected" to the proposed timber sales and, thus, the Forest Service was required to analyze both "actions" in the same EIS. *See Peterson*, 753 F.2d at 758; *Save the Yaak Committee*, 840 F.2d at 720.

The Court does not see how *Save the Yaak Committee* and *Peterson* are analogous to the situation at issue. Both of these cases included two specific and concrete projects (construction of a specific road and a specific timber sale project) that could not proceed without each other. *See Peterson*, 753 F.2d at 756 ("[I]t is clear that the timber sales cannot proceed without the road, and the road would not be built but for the contemplated timber sales.") Neither *Save the Yaak Committee* nor *Peterson* held that the Forest Service had to examine the environmental impacts of the entire system of existing forest routes in connection with the proposed timber sale project or in connection with the addition of one logging road. Here, Plaintiffs have pointed to only one specific "action" undertaken by the Forest Service—the MTM project. The other alleged "action"—the existing infrastructure of roads and trails on the Klamath Forest—was created long before and independent of the MTM project and thus does not have "a clear nexus" to the MTM project. *See Save the Yaak Comm.*, 840 F.2d at 720 (quoting *Peterson*, 753 F.2d at 758).

As Plaintiffs correctly state, "[t]he purpose of [the connected action] requirement is to prevent an agency from dividing a project into multiple 'actions,' each of which individually has an insignificant environmental impact, but which collectively have a substantial impact." Pls' Mot. at 17 (quoting *Great Basin Mine Watch*, 456 F.3d at 969). This "divide and conquer" concern, *see Pacific Coast Federation of Fishermen's Ass'n v. Blank*, 693 F.3d

1084, 1099–100 (9th Cir.2012), is simply not present in here.

Therefore, the Forest Service's decision to address the existing NFTS infrastructure as part of the environmental baseline, as opposed to a "connected" action, was not arbitrary, capricious or abuse of discretion.

### b. Cumulative impact

With respect to "cumulative" actions, NEPA requires the agency to consider the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7.

Plaintiffs argue that the Forest Service should have considered the cumulative impact of the existing NFTS and the proposed MTM project because "it would be 'irrational, or at least unwise' ... to consider designating 73 miles of routes as part of the NFTS without continuing to permit motorized use on the preexisting 4,536-mile NFTS." Pls' Mot. at 20. Plaintiffs' contention here bears a striking resemblance to the argument that the district court for the District of Idaho recently rejected in *Idaho Conservation League v. Guzman*, 766 F.Supp.2d 1056 (D.Idaho 2011).

In *Guzman*, environmental groups challenged the Forest Service's Travel Management Plan for the Salmon–Challis National Forest. *Id.* at 1059. Plaintiffs contended that the Forest Service "erred by limiting the analysis of environmental impacts to the 109 miles of newly-designated routes and ignoring the environ-

mental impacts from: (1) on-going use of 783 miles of previously-authorized routes, and (2) on-going effects of the 487.6 miles of motorized routes closed under the Travel Plan." *Id.* at 1065. The court disagreed and explained that the Forest Service did not violate NEPA's requirement to analyze cumulative impacts because "the Travel Plan result[ed] in no new routes upon the landscape and actually reduce[d] the total mileage available for motorized use." *Id.* at 1066. Therefore, "it was reasonable for the Forest Service to conclude that the Travel Plan would not result in additive or cumulative impacts to wilderness values and roadless characteristics." Importantly for the purposes of the cross-motions before this Court, the court in *Guzman* agreed that the Forest Service's decision to consider the existing infrastructure of forest roads as "the environmental baseline" was reasonable. *Id.* at 1065.

■ This Court similarly holds that the Forest Service's decision not to analyze cumulative impacts of the existing NFTS infrastructure was not arbitrary, capricious or abuse of discretion. The MTM project greatly reduces motorized motor vehicle use on the Klamath National Forest compared to the environmental baseline of the pre-MTM motorized use. *See* AR 608 (stating that, under the ROD, cross-country travel would be prohibited on "all 1.7 million acres," while "currently [it is] prohibited on 500,000 acres"). The MTM reduces the total amount of routes subject to motorized use by more than 800 miles. The 73 miles of user-created routes that the Forest Service has added to the NFTS as a result of the MTM project already exist on the landscape and "are 'new' only in terms of their official designation" under the MTM project. *See Guzman,* 766 F.Supp.2d at 1066. The Forest Service "carefully selected" those routes to achieve the third stated purpose of the MTM project—to provide motorized ac-

cess to certain dispersed recreational opportunities. AR 604.

Plaintiffs are attempting to expand the limited scope of the MTM project to a level far beyond the purpose and scope reasonably contemplated by the Forest Service. Accepting Plaintiffs' argument would require courts to scrutinize the entire 4,536 mile Klamath NFTS every time the Forest Service proposes a mile-long addition to the existing system. Therefore, the Court concludes that the Forest Service appropriately analyzed the existing NFTS infrastructure as the "environmental baseline" without analyzing the cumulative impacts of the entire NFTS system.

**3. The Forest Service Adequately Disclosed Environmental Information and Consequences of the Proposed Action**

Plaintiffs argue that the FEIS and ROD "fail to disclose several key pieces of information, which makes assessment of the environmental consequences of the proposed project impossible." Pls' Mot. at 21. In particular, Plaintiffs contend that the Forest Service failed to disclose four sources of information: (1) the land use allocations in which the 73 miles of routes added to the NFTS occur, and the corresponding Northwest Forest Plan Standards and Guidelines for those land use allocations; (2) the environmental consequences of the existing NFTS; (3) the NEPA decisions that support the authorization of the existing NFTS; and (4) compliance with the Clean Water Act. *Id.* at 20–24.

First, Plaintiffs argue that "the FEIS and ROD did not disclose information regarding specific roads and the land use allocation and Key Watershed designations where those roads are located, or the corresponding Standards and Guidelines for each land use allocation or Key Watershed." *Id.* at 21. As a threshold matter, Defendants argue that Plaintiffs have

waived this claim by failing to first bring it to the Forest Service's attention during the administrative process and failing to raise it during the public comment process. Dfts' Opp. at 17.

■ To challenge an administrative decision such as approval of an EIS by an agency, a plaintiff must first exhaust all available administrative remedies required by statute. *Darby v. Cisneros*, 509 U.S. 137, 146–47, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993). Statutes and regulations governing the Forest Service impose an exhaustion requirement on Plaintiffs in challenging the FEIS and ROD. *See Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 965 (9th Cir.2002); *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 898–900 (9th Cir.2002). The Forest Service must have been afforded the opportunity to give any issue raised by Plaintiffs "meaningful consideration" during the administrative process. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004). Therefore, if Plaintiffs failed to raise an issue during the administrative process, they forfeit any objection to an EIS on the basis of that issue. *Id.* at 764–65, 124 S.Ct. 2204.

However, the Ninth Circuit interprets the exhaustion requirement broadly. *See, e.g., Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1065 (9th Cir.2010). During administrative proceedings, a party "need not raise an issue using precise legal formulations, as long as enough clarity is provided that the decision maker understands the issue raised." *Lands Council v. McNair*, 629 F.3d 1070, 1076 (9th Cir.2010). "The plaintiffs have exhausted their administrative appeals if the appeal, taken as a whole, provided sufficient notice to the Forest Service to afford it an opportunity to rectify the violations that the plaintiffs alleged." *Native Ecosystems Council*, 304 F.3d at 899. An argument is not pre-served, however, if the connection between the concerns expressed during administrative proceedings and the issues raised in court is "too attenuated." *Great Basin Mine Watch*, 456 F.3d at 967. Ultimately, "there is no bright-line standard as to when this requirement has been met[,] and [the court] must consider exhaustion arguments on a case-by-case basis." *Idaho Sporting Cong.*, 305 F.3d at 965.

Review of the administrative record does not support Defendants' contention that the issue now litigated by Plaintiffs is absent from the underlying record. During the administrative process, Plaintiff Klamath–Siskiyou Wildlands Center ("KS Wild") expressed its concerns about site-specific environmental impacts and site-specific mitigation measures of the proposed MTM project. *See e.g.*, AR 108, 116–117, 144. Therefore, the issue of whether the FEIS and ROD adequately disclosed site-specific information showing where the proposed routes were physically located on the landscape is properly before the Court.

Having found that Plaintiffs satisfied the exhaustion requirement, the Court proceeds to the substantive analysis of Plaintiffs' contention that the Forest Service failed to disclose site-specific information regarding routes in Key Watersheds and other land use allocations or the impact of the MTM ROD in these areas. *See* Pls' Mot. at 21.

NEPA "requir[es] agencies to take a 'hard look' at how the choices before them affect the environment." *Oregon Natural Desert Ass'n v. Bureau of Land Management*, 625 F.3d 1092, 1099 (9th Cir.2010). This "hard look" requirement mandates a "reasonably thorough discussion of the significant aspects of the probable environmental consequences." *State of Cal. v. Block*, 690 F.2d 753, 761 (9th Cir.1982) (citation omitted). "[A] reviewing court [must] make a pragmatic judgment wheth-

er the EIS's form, content and preparation foster both informed decision-making and informed public participation." *Id.*

The MTM FEIS states that "[a]bout 60 miles of unauthorized routes [proposed for addition to the NFTS] are located within [riparian reserves] on the west side of the [Klamath National Forest], and 7 miles on the east side." AR 1089; *see also* ROD Maps, AR 712–14; FEIS Maps, AR 782–99. The FEIS discloses the total miles of routes in Key Watersheds and further identifies the individual routes proposed to be added to the NFTS in Key Watersheds. AR 1064, 1078, 1088, 5543–48. Additionally, the record contains detailed maps of the unauthorized routes to be added as part of the proposed alternative, *see id.* at 712–14, and provides sufficient information on the location of the proposed routes in Key Watersheds and Riparian Reserves. *See id.* at 1089. Further, the FEIS describes the associated impacts the additions of these routes may have on the environment. *See, e.g., id.* at 1062–78 (discussing environmental consequences of adding routes in Riparian Reserves and Key Watersheds); *id.* at 1143–54 (discussing impacts to LSR-associated species). Finally, the FEIS identifies the Standards & Guidelines applicable to both Riparian Reserves and Key Watersheds, as well as other land areas. *See, e.g., id.* at 1061–62, 1083–84 (disclosing S & Gs applicable to Riparian Reserves and Key Watersheds); *id.* at 1235 (disclosing S & Gs applicable to LSRs).

The Court finds that the information disclosed by the Forest Service with respect to site-specific locations of the proposed routes in Key Watersheds and other land use allocations provided Plaintiffs with sufficient information to evaluate the environmental effects of the proposed action.

Further, Plaintiffs contend that the Forest Service "failed to disclose and discuss the environmental consequences of the existing, designated National Forest Transportation System" and "failed to disclose the NEPA documentation to support the existing NFTS." Pls' Mot. at 22. According to Plaintiffs, "[t]he FEIS fails to explain how the record supports that all 4,536 miles of roads the agency claims are part of the NFTS and available for public use were approved for long-term motor vehicle use pursuant to a valid NEPA process." *Id.* Plaintiffs also argue that the "agency did not provide the public with NEPA decision documents, nor did it establish that routes were exempt from NEPA's requirements." *Id.* at 23. Plaintiffs' criticism is unfounded.

As analyzed above, the MTM project does not, and need not to, involve a comprehensive environmental assessment of the entire NFTS. The ROD's is limited to evaluating whether and to what extent the Forest Service should allow motorized use on previously unauthorized roads on the Klamath Forest. Therefore, the Forest Service did not have an obligation to assess and disclose the environmental impacts of the existing, designated NFTS routes. Additionally, Plaintiffs have not provided any authority requiring the Forest Service to prove that previous projects within the NFTS were properly approved under NEPA. As mentioned above, the Travel Management Rule expressly does not require the Forest Service to revisit the NFTS at this point.[7] *See* 36 C.F.R. § 212.50(b).

7. Additionally, NEPA does not require the Forest Service to evaluate the impacts of federal actions completed prior to the passage of NEPA. *See Jicarilla Apache Tribe of Indians v. Morton,* 471 F.2d 1275, 1282 (9th Cir.1973). As the Forest Service points out, a majority of the NFTS was put into place well before January 1, 1970, when NEPA's obligations became applicable. *See* AR 916. Thus, the Forest Service need not retroactively analyze and

Therefore, the Forest Service did not violate NEPA by failing to assess and disclose environmental impacts of the NFTS or by failing to disclose the NEPA documentation to support the existing NFTS.

Finally, Plaintiffs contend that "the FEIS and ROD do not disclose how the proposed action complies with the Clean Water Act and all other federal and non-federal requirements pertaining to water quality." Pls' Mot. at 23.

"Unlike the CWA, NEPA does not require particular environmental standards or mandate that agencies achieve substantive environmental results." *Greater Yellowstone Coal.*, 628 F.3d at 1150. All that NEPA requires from the Forest Service is to "inform the public that [the agency] has indeed considered environmental concerns in its decisionmaking process." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983) (quotations omitted). Contrary to Plaintiff's contention, the FEIS contains a detailed analysis of the MTM project's impact on water resources of the Klamath National Forest. *See* AR 1060–80. The Hydrology section of the FEIS analyzes in detail direct and indirect effects of the prohibition of cross-country motor vehicle travel, direct and indirect effects of adding user-created routes to the NFTS, and cumulative effects of the MTM project and other ongoing or foreseeable management projects. *Id.* The FEIS also provides a comprehensive alternative-by-alternative discussion of the MTM project's environmental impacts on water resources. *Id.* at 1068–76. Further, the FEIS addresses the obligations imposed on the Forest Service by the CWA and other statutes and regulations pertaining to water quality and discloses how the agency will comply with applicable water quality laws in its implementation of the

disclose the impacts of any decisions made

MTM project. *Id.* at 1060–62, 1078–81. After analyzing the MTM project's impacts on the hydrological resources in the affected areas, the Forest Service reasonably concluded that, by eliminating most off road vehicle access, the ROD would foster better water conditions within the NFTS as a whole and by individual watershed. *Id.* at 1079.

Therefore, the Forest Service has satisfied its duty under NEPA to inform the public on how the proposed action complies with the CWA and other federal and non-federal requirements pertaining to water quality.

**B. National Forest Management Act and Northwest Forest Plan**

■ Plaintiffs advance four main arguments why the ROD violates provisions of the NFMA and NWFP: (1) the Forest Service violated the NWFP's prohibition on new construction of roads and corresponding expansion of the NFTS in Key Watersheds; (2) the Forest Service violated NWFP S & G WR–3 by improperly relying upon "mitigation" or "planned restoration" as a "substitute for preventing habitat degradation"; (3) the Forest Service failed to designate "unstable and potentially unstable areas" as "Riparian Reserves"; and (4) the ROD fails to comply with the NWFP Aquatic Conservation Strategy ("ACS") objectives for maintenance and restoration of water quality and sediment regime. Pls' Mot. at 24–27.

First, Plaintiffs assert that the Standard and Guideline pertaining to Key Watersheds requires the Forest Service to "reduce existing system and nonsystem mileage" and prohibits any "net increase in the amount of roads in Key Watersheds." *Id.* at 24 (citing AR 18393).

prior to 1970.

The specific direction from the Klamath LRMP, which includes the "no net increase" provision, explains that "for each mile of new road constructed, at least one mile of road should be decommissioned and priority given to roads that pose the greatest risk to riparian and aquatic ecosystems." S & G 6–24, AR 7328. The Klamath Forest Service interpreted this provision to require that, across all projects undertaken pursuant to the LRMP, any new construction must be offset with a corresponding amount of decommissioning. AR 689. The Forest Service's interpretation of its own LRMP is entitled to deference. *League of Wilderness Defenders v. U.S. Forest Serv.*, 549 F.3d 1211, 1223 (9th Cir.2008).

As a result of the MTM project, the Forest Service has added 6.7 miles of existing unauthorized routes, located in Key Watersheds, to the NFTS.[8] AR 1075. The ROD provides that approximately 100 miles of NFTS roads and 58 miles of user-created routes have been decommissioned since the Klamath LRMP was issued. *Id.* at 689. Additionally, another 15 miles of roads are scheduled for decommissioning in the near future. *Id.*

To demonstrate that the Forest Service violated its duty to avoid "net increases" in the amount of roads in Key Watersheds, Plaintiffs assert that (1) the Forest Service allegedly admitted that adding unauthorized roads to the Forest Transportation System is considered "new construction," Pls' Mot. at 24 (citing AR 5751); and (2) the Forest Service cannot " 'take credit' for historic road remediation in order to comply with [the NWFP]." Pls' Reply at 13. Defendants counter that (1) designat-

ing existing user-created roads as NFTS roads does not constitute "new construction" or "net increase" in the amount of roads,[9] Dfts' Opp. at 22; and (2) "new construction may be weighed against prior decommissioning actions," Dfts' Reply at 12.

To resolve whether the Forest Service has violated the NWFP's prohibition on expansion of the NFTS in Key Watersheds, the Court need not decide whether "new construction" includes designating existing unauthorized roads or whether the Forest Service can take credit for historic road decommissioning. The Forest Service has complied with its obligation even if the Court agrees with Plaintiffs' arguments. As the administrative record demonstrates, the Forest Service's addition of 6.7 miles of user-created roads in Key Watersheds is sufficiently offset by the agency's undertaking to decommission 15 miles of existing NFTS roads in the near future. *See* AR 689.

Second, Plaintiffs contend the Forest Service violated NWFP S & G WR–3 by improperly relying upon "mitigation" or "planned restoration" as a "substitute for preventing habitat degradation." Pls' Mot. at 25. Plaintiffs maintain that, instead of adopting mitigation measures, the Forest Service was required under the NWFP to "avoid the problem altogether by not designating roads that require mitigation." *Id.*

NFWP S & G WR–3 and the corresponding Klamath LRMP S & G 10–12 on their face apply only to Riparian Reserves. *See* AR 7412, 18445; *see also Oregon Nat-*

---

8. Plaintiffs assert that the ROD adds 73 miles of routes to the NFTS and that all of those miles are within Key Watersheds. Pls' Mot. at 24. However, according to the administrative record, only 6.7 miles out of the 73 miles added to the NFTS are located in Key Watersheds. AR 1075.

9. Defendants point out that AR 5751, on which Plaintiffs rely, applies only to the management of inventoried roadless areas, and not key watersheds. Dfts' Opp. at 22.

*ural Resources Council Fund v. Goodman,* 505 F.3d 884, 894 (9th Cir.2007) ("[S & G] WR–3 ... prohibits the Forest Service from 'us[ing] mitigation or planned restoration as a substitute for preventing habitat degradation' within *Riparian Reserves."*) (emphasis added). Contrary to Plaintiffs' argument, the FEIS adequately demonstrates that the designation of new routes would not have a negative environmental impact on any terrestrial wildlife species in Riparian Reserves. As Defendants point out, none of the 6.7 miles of routes to be added to the NFTS in Key Watersheds traverse known or historically occupied fish habitat for threatened, endangered, or sensitive fish species. *See* AR 1088–89. The National Marine Fisheries Service, with which the Forest Service consulted as required under § 7 of the Endangered Species Act ("ESA"), 16 U.S.C. § 1536, concluded that the proposed action is not expected to have any adverse effect on, and may in fact benefit, terrestrial wildlife species. *Id.* at 1179–80, 1183, 1191–94. Therefore, the FEIS adequately demonstrates that the MTM project would not cause "habitat degradation" in Riparian Reserves. In fact, closure of most of the unauthorized routes on the Forest is expected to have an overall beneficial environmental impact on the habitat in the affected areas. Therefore, the agency's use of mitigation measures did not violate NWFP S & G WR–3.

Third, Plaintiffs contend that the NWFP requires that the Forest Service designate "unstable and potentially unstable areas" as "Riparian Reserves" during "project design and implementation." Pls' Mot. at 25.

As a threshold matter, Defendants argue that Plaintiffs waived this argument by not raising it during their comments on the DEIS and FEIS and in the administrative appeal. Dfts' Mot. at 23. Plaintiffs counter that they have not forfeited their Riparian Reserves claim because, throughout the public involvement process, Plaintiff KS Wild specifically inquired about protection of steep and unstable areas. Pls' Reply at 14. The administrative record demonstrates that KS Wild indeed expressed its concern about routes on steep slopes and erosive soils, routes in unstable areas and sediment production from those routes, and roads in hydrologically sensitive areas. *See* AR 117, 134, 135, 2638. However, the record is devoid of any indication that Plaintiffs requested the Forest Service to designate any unstable or potentially unstable areas as Riparian Reserves.

As analyzed above, if Plaintiffs failed to raise an issue during the administrative process, they forfeit any objection to an EIS on the basis of that issue. *See Dep't of Transp. v. Pub. Citizen,* 541 U.S. at 764–65, 124 S.Ct. 2204. "[P]laintiffs have exhausted their administrative appeals if the appeal, taken as a whole, provided sufficient notice to the Forest Service to afford it an opportunity to rectify the violations that the plaintiff alleged." *Native Ecosystems Council,* 304 F.3d at 899.

In *Bark v. Larsen,* the district court for the District of Oregon considered whether the plaintiff waived its claim that the Forest Service failed to "undesignate" areas previously designated as Riparian Reserves when the plaintiff's comments submitted to the agency during the administrative proceedings were limited to "general discussion of logging unstable lands within Riparian Reserves." *Bark v. Larsen,* 2006 WL 4852688, at *2 (D.Or. 2006). The court found that the plaintiff had not exhausted its administrative remedies with respect to the Riparian Reserves claim because "there is no reasonable basis to expect the Forest Service to understand plaintiff's general discussion of logging unstable lands within Riparian Reserves as a challenge to the agency's

previous reserve designations." *Id.* The *Bark* court further explained that, even though the plaintiff "raised certain concerns about ... logging in unstable areas," "the plaintiff's appeals and comments ... never used language, precise or general, that would place the Forest Service on notice that plaintiff contested the Forest Service's decision regarding the proper designation of Riparian Reserves." *Id.* Thus, "the Forest Service had no reason to suspect that plaintiff's ... concerns with logging in unstable areas were somehow intended to raise issues regarding the propriety of the previously designated Riparian Reserve boundaries." *Id.*

■ Here, like in *Bark*, Plaintiffs' comments communicated to the Forest Service during the administrative proceedings were limited to Plaintiffs' general concerns about designating roads located in unstable or potentially unstable areas. The record demonstrates that the Forest Service adequately considered these concerns by evaluating routes traversing unstable or potentially unstable areas, and areas containing erodible soils and addressed routes that existed in such locations. *See, e.g.,* AR 689, 1490, 5222–45. However, nothing in Plaintiffs' general comments about adding roads in unstable areas put the Forest Service on notice that Plaintiffs sought designation of those areas as Riparian Reserves. Because Plaintiffs did not provide the Forest Service with "an opportunity to exercise its expertise to resolve [the] claim," *see Native Ecosystems Council,* 304 F.3d at 899, their Riparian Reserves claim was not properly exhausted and is not subject to judicial review.

Finally, Plaintiffs contend that the ROD fails to comply with the NWFP Aquatic Conservation Strategy ("ACS") objectives for maintenance and restoration of water quality and sediment regime. Pls' Mot. at 26–27. The nine ACS Objectives were de-

veloped "to restore and maintain the ecological health of watersheds and aquatic ecosystems contained within them on public lands." AR 1061. Plaintiffs are especially concerned about the Forest Service's compliance with ASC Objectives 4 and 5, which require the Forest Service to "maintain and restore water quality necessary to support healthy riparian, aquatic, and wetlands ecosystems" and "maintain and restore the sediment regime under which aquatic ecosystems evolved." Pls' Mot. at 26–27 (citing AR 18385).

Contrary to Plaintiffs' argument, the administrative record demonstrates that the Forest Service reasonably concluded that the ROD will have the overall effect of reducing sediment delivery, thereby improving water quality in the affected areas. AR 1069–70, 1074–76. The MTM project is expected to improve existing environmental conditions both forest-wide and by individual watershed. *Id.* at 1079. The Hydrology and Fisheries sections of the FEIS adequately analyze and disclose the impacts of the MTM project on water quality and watersheds. *Id.* at AR 1069–70, 1074–76.

Further, Biological Assessment, which considered potential impacts of the project on sensitive fish species and species listed under the ESA, determined that the proposed action would have no significant effects, because (1) no new routes are being created; (2) sediment delivery from the areas at issue is negligible, (3) the only perennial stream-crossing proposed to be added to the NFTS is outside coho salmon habitat and will be reinforced and monitored annually for five years; and (4) the closing of vast majority of cross-country routes will have an overall beneficial effect. *Id.* at 5370–72. The National Marine Fisheries Service also concurred in the Forest Service's assessment. *Id.* at 4037–38. Similarly, the Management Indicator

Species Report, which analyzed potential effects on rainbow and steelhead trout, concluded that the effects of the MTM project will be insignificant in the short run and largely beneficial in the long run. *Id.* at 5510–12, 1108–1112. Therefore, the administrative record demonstrates that the Forest Service has complied with the ACS Objectives.

As a conclusion, the MTM ROD complies with the Northwest Forest Plan requirements. Therefore, Plaintiffs failed to demonstrate that the Forest Service's decision to implement the ROD is arbitrary, capricious or abuse of discretion.

### C. Clean Water Act

■ Plaintiffs argue that "[t]he Forest Service violated the CWA because it failed to demonstrate that the designation of a 4,600–plus–mile motorized route network system adheres to water quality protections, particularly those provisions related to sediment input." Pls' Mot. at 28. Defendants counter that Plaintiffs' CWA claim lacks merit because: (1) Plaintiffs have failed to identify any State laws or regulations pertaining to nonpoint source pollution that the Forest Service violated; and (2) the Forest Service has complied with all applicable CWA requirements and has taken adequate measures to control sediment runoff. Dfts' Opp. at 27–29.

As the Court stated earlier, the CWA's regulatory means differ significantly for point source discharges and nonpoint source pollution. *Pronsolino,* 291 F.3d at 1126. The case law suggests, and the parties do not dispute, that the instant action concerns nonpoint source pollution. *See, e.g., Environmental Protection Information Center v. Pacific Lumber Co.,* 2003 WL 25506817, at *4 (N.D.Cal.2003) (stating that runoff from activities inherent to forest management such as "surface drainage," and "road construction and maintenance" is not point source pollution).

Nonpoint source pollution "is not regulated directly" by the CWA, and is instead left to the States to regulate under state programs. *Oregon Nat'l Desert Ass'n,* 172 F.3d at 1096. The State of California has developed TMDLs for three of the four watersheds comprising the Klamath Forest (the Scott, Shasta, and Salmon Rivers), and a draft TMDL for the fourth watershed (the Klamath River). AR 1061.

In support of their argument that the Forest Service violated the CWA, Plaintiffs rely on 40 C.F.R. § 131.12, which, according to Plaintiffs, prohibits the Forest Service to "exacerbate already-degraded [water quality] conditions and contribute to further degradation." Pls' Mot. at 28. On its face, the federal antidegradation rule established in § 131.12 applies only to States, and not to federal agencies. 40 C.F.R. § 131.12 ("The State shall develop and adopt a statewide antidegradation policy and identify the methods for implementing such policy pursuant to this subpart."); *see also City of Olmsted Falls, Ohio v. U.S. Environmental Protection Agency,* 435 F.3d 632, 637 (6th Cir.2006) ("In fact, § 131.12 only places obligations on states. It does not mention any other actor but states. Corps Defendants cannot be liable for violations of this regulation when they have no obligations under it."). Additionally, provisions in 40 C.F.R. Part 131 merely contain "model water quality standards" to "provide[ ] States with substantial guidance in the drafting of [their] water quality standards." *Arkansas v. Oklahoma,* 503 U.S. 91, 101, 112 S.Ct. 1046, 117 L.Ed.2d 239 (1992). In their CWA claim, Plaintiffs have not identified any California statutes or regulations establishing water quality standards with which the Forest Service failed to comply. Thus, Plaintiffs' CWA claim fails as a matter of law.

Additionally, the administrative record demonstrates that the Forest Service has

adequately complied with its obligations under the CWA and that the MTM project would not result in degradation to sediment-impaired waters on the Klamath Forest. Of the four rivers on the Klamath, only the Scott River has a TMDL for sediment.[10] AR 18273. The Scott River implementation plan directed the State Regional Water Board and federal land-management agencies (including the Forest Service) to enter a memorandum of understanding ("MOU") to address, among other things, sediment discharges within the Scott River watershed. *Id.* at 18105. In 2008, the Forest Service and the Water Board entered such a MOU, in which the Forest Service agreed to "prevent or minimize future sediment discharges by implementing the appropriate management practices to meet the BMPs [Best Management Practices] described in Water Quality Management for National Forest System Land in California." *Id.* at 18274.

The FIES provides that the Forest Service will meet its obligations under the MOU by implementing components of BMP 4–7, which directs the Forest Service to identify routes where off-highway vehicle use could degrade water quality, identify proper mitigation measures to control erosion on these routes, and restrict off-highway vehicle use to designated routes. *Id.* at 1060–61, 1078–79, 1110, 14853. Additionally, all roads designated as NFTS roads under the ROD will be subject to a number of BMPs related to road maintenance and mitigation measures. *See id.* at 1060, 1079, 1110. Those mitigation measures include, among other measures, installation of stream-crossings, BMP–1, *id.* at 14753, and drainage controls, BMP 2–7, *id.* at 14757–58. The FEIS also provides site-specific mitigation measures to minimize sediment associated with addition of user-created routes to the NFTS. *Id.* at 1057. In light of anticipated implementation of these BMPs, the Forest Service reasonably concluded that the MTM decision will cause "reduction to sediment delivery to stream channels." *Id.* at 5510.

Further, the ROD specifically states that the Forest Service will manage non-point source pollution through implementation of the existing TDML action plans for the Scott and Salmon Rivers and the anticipated TMDL for the Klamath River (when such a TDML is adopted). *Id.* at 631. The ROD concludes that the MTM project will "help to achieve the TMDL requirements" "by reducing road density, reducing vehicle-generated sediment, and reducing the potential for sediment delivery to streams." *Id.; see also id.* at 1079 ("Water quality is expected to improve from pre-project conditions, both forest-wide and by individual watershed."); *id.* at 5511 (effects associated with route additions are "expected to be insignificant in the short term and beneficial in the long term").

In their Reply, Plaintiffs also assert that the Forest Service failed to comply with the Water Quality Management Plan contained in the "Water Quality Management for National Forest System Lands in California." Pls' Reply at 19. The Water Quality Management Plan states that "system roads will be identified during the transportation planning for decommissioning/ obliteration. These roads will be analyzed under the NEPA process for removal from the transportation system or downgraded in maintenance level." AR 14771–72. Plaintiffs contend that, in violation of the Water Quality Management Plan, the Forest Service "has expressly

---

10. At the time the Forest Service issued its MTM decision, the Scott River had a TDML for temperature and sediment, AR 18273; the Shasta River had a TMDL for dissolved oxygen and temperature, *id.* at 18116; the Salmon River had a TMDL for temperature, *id.* at 18265; and the Klamath River had no TMDL, *id.* at 1257.

refused to identify system roads for decommissioning/obliteration during the MTM process, indicating that it has also failed to comply with the Basin Plan." Pls' Reply at 19. As analyzed in the NEPA section of this opinion, Plaintiffs improperly attempt to expand the MTM project's scope to require the Forest Service to consider decommissioning existing NFTS routes within the MTM project. However, pursuant to its stated purpose, the MTM project is limited to addressing motor vehicle use off the NFTS, and not to reexamine whether existing NFS roads currently managed as open to public motor vehicle use should remain open, or be closed or decommissioned. Thus, Plaintiffs contention that the MTM project does not comply with the Water Quality Management Plan fails.

Therefore, the Forest Service has complied with the provisions of the CWA in adopting the MTM ROD.

## CONCLUSION

The Forest Service did not act arbitrarily and capriciously in its review and approval of the MTM project. The Forest Service complied with NEPA's procedural requirements by considering a reasonable range of alternatives, by taking a "hard look" at the environmental impacts of the proposed action, and by disclosing the results of its environmental assessment to the public. The Forest Service also complied with the requirements of the NFMA and CWA. Therefore, the Court GRANTS Defendants' Motion for Summary Judgment in its entirety, and DENIES Plaintiffs' Motion for Summary Judgment.

The Court directs the Clerk of the Court to close the file.

IT IS SO ORDERED.